**In re ADOPTION OF BABY BOY BROOKS.**■

[Cite as *In re Adoption of Baby Boy Brooks* (2000), 136 Ohio App.3d 824.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–481.

Decided March 21, 2000.

*James S. Albers*, for appellant.

*Donnita R. Carroll*, for appellee Theo Phelps.

*Elaine Oser Zingg*, for appellee Karen Brooks.

LAZARUS, Judge.

Appellant, LDS Social Services ("appellant" or "LDS"), appeals from a decision and entry of the Franklin County Probate Court, overruling LDS's objections to a magistrate's decision dismissing a petition to adopt Baby Boy Brooks because his biological father, appellee, Theo Phelps ("Phelps"), objected to the adoption.

The issue is whether Phelps waived his right to withhold consent to the adoption of his biological son by failing to register with the putative father registry within thirty days of his son's birth even though Phelps judicially established his paternity prior to the filing of the petition to adopt his son. Because we find that the trial court correctly held that Phelps's consent is required under the clear and unambiguous statutes governing adoption in Ohio, we affirm.

On March 3, 1998, Baby Boy Brooks was born to appellee, Karen Brooks. Three days later, Karen Brooks permanently surrendered the child to LDS, an Ohio licensed adoption agency, and executed an affidavit indicating that Phelps was the father of the child. Brooks and Phelps were never married. On that same day, Baby Boy Brooks was placed with his prospective adoptive family. On April 17, 1998, the administrator of the putative father registry certified that a search of the registry, conducted on April 16, 1998, revealed that no putative father was registered for Baby Boy Brooks.

On May 6, 1998, Phelps filed a complaint in juvenile court to establish a father-son relationship with Baby Boy Brooks. On July 1, 1998, Phelps registered with the Putative Father Registry. On July 22, 1998, a juvenile court magistrate held a hearing in Phelps's parentage action, and, on August 17, 1998, the magistrate issued a decision establishing the father-son relationship between Phelps and Baby Boy Brooks. This decision was adopted by a judge of the juvenile court on the same date, and pursuant to Civ.R. 53(E)(4)(c), the trial court entered judgment finding that immediate relief was justified. LDS timely objected, but these objections were overruled by the juvenile court judge in a decision filed December 8, 1998.

On September 29, 1998, Baby Boy Brooks's prospective adoptive parents filed a petition for adoption in the probate court. On October 16, 1998, Phelps filed an objection to the adoption and sought a writ of habeas corpus to obtain custody of Baby Boy Brooks. Phelps contended that the adoption of Baby Boy Brooks was not lawful absent his consent. A hearing was held by a probate court magistrate on December 4, 1998, to determine if Phelps's consent was necessary for the adoption to proceed. In a decision, containing findings of fact and conclusions of law, filed December 9, 1998, the probate court magistrate found that Phelps's consent to the adoption was required under R.C. 3107.06 and 3107.07 because he was adjudicated to be the parent of Baby Boy Brooks on August 17, 1998, before the petition for adoption was filed on September 29, 1998. Accordingly, the magistrate ruled that the petition for adoption be dismissed.

LDS timely objected to the magistrate's decision. In a decision and entry filed March 30, 1999, the probate court overruled LDS's objections, dismissed the adoption petition, and certified the writ of habeas corpus (and revocation of

permanent surrender) to the juvenile court. It is from this judgment entry that LDS appeals, raising the following four assignments of error:

"The Franklin County Probate Court erred in dismissing the Appellant's Petition to adopt by determining:

"A. That Theo Phelps was not considered a putative father subject to the requirements of 3107.061 et seq., despite his failure to register with the Putative Father Registry, because he had sought to establish a parent-child relationship in the Juvenile Division of the Franklin County Court of Common Pleas prior to the filing of a petition to adopt in the Franklin County Probate Court.

"B. That no conflict exists between R.C. 3107.06(B)(3) and R.C. 3107.07(B)(1) concerning the status of putative fathers.

"C. That the adoption of Baby Boy Brooks could not proceed without the consent of Theo Phelps.

"D. That the best interests of the child should not be considered at the same time it is decided whether consents to the adoption are required."

In its first, second, and third assignments of error, appellant challenges the trial court's interpretation of the relevant statutes governing who must consent to an adoption under Ohio law. In particular, appellant challenges the trial court's ruling that Phelps's consent was required by application of R.C. 3107.06 and 3107.07.

R.C. 3107.06 provides, in relevant part, as follows:

"Unless consent is not required under section 3107.07 of the Revised Code, a petition to adopt a minor may be granted only if written consent to the adoption has been executed by all of the following:

"(A) The mother of the minor;

"(B) The father of the minor, if any of the following apply:

"(1) The minor was conceived or born while the father was married to the mother;

"(2) The minor is his child by adoption;

"(3) Prior to the date the petition was filed, it was determined by a court proceeding pursuant to sections 3111.01 to 3111.19 of the Revised Code, a court proceeding in another state, an administrative proceeding pursuant to sections 3111.20 to 3111.29 of the Revised Code, or an administrative proceeding in another state that he has a parent and child relationship with the minor;

"(4) He acknowledged paternity of the child and that acknowledgement has become final pursuant to section 2151.232, 3111.211, or 5101.314 of the Revised Code.

"(C) The putative father of the minor[.]"

R.C. 3107.07 provides in relevant part as follows:

"Consent to adoption is not required of any of the following:

"* * *

"(B) The putative father of a minor if either of the following applies:

"(1) The putative father fails to register as the minor's putative father with the putative father registry established under section 3107.062 of the Revised Code not later than thirty days after the minor's birth;

"(2) The court finds, after proper service of notice and hearing, that any of the following are the case:

"(a) The putative father is not the father of the minor;

"(b) The putative father has willfully abandoned or failed to care for and support the minor;

"(c) The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first."

Appellant argues that, under R.C. 3107.07(B)(1), Phelps waived his right to withhold his consent to the adoption of Baby Boy Brooks because he failed to register with the putative father registry within thirty days of the birth of Baby Boy Brooks. Appellant also asserts that, to the extent R.C. 3107.07(B) conflicts with the language in R.C. 3107.06(B)(3) requiring the consent of an adjudicated father, such conflict be resolved in a manner that gives full force and effect to the thirty-day putative father registration requirement. According to appellant, the thirty-day putative father registration requirement must take priority because (1) it was enacted more recently than the provision requiring consent of an adjudicated father, (2) the General Assembly intended that there be no exception to the thirty-day filing requirement when it rejected a provision granting a grace period for certain putative fathers who are unable to timely register, and (3) failure to do so would undermine reliance on the registry and create uncertainty in the adoption process. We find appellant's contentions unpersuasive.

As in any case of statutory construction, the paramount goal is to ascertain and give effect to the legislature's intent in enacting the statute. *Brooks v. Ohio State Univ.* (1996), 111 Ohio App.3d 342, 349, 676 N.E.2d 162, 166 (citing *Featzka v. Millcraft Paper* [1980], 62 Ohio St.2d 245, 16 O.O.3d 280, 405 N.E.2d 264). In so doing, however, the court must first look to the plain language of the statute itself to determine the legislative intent. *State ex rel. Burrows v. Indus. Comm.* (1997), 78 Ohio St.3d 78, 81, 676 N.E.2d 519, 521; *In re*

*Collier* (1993), 85 Ohio App.3d 232, 237, 619 N.E.2d 503, 506. ("Under Ohio law, it is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent.") Thus, if the language used in a statute is clear and unambiguous, the statute must be applied as written and no further interpretation is necessary. *Burrows, supra.* "It is only where the words of a statute are ambiguous, uncertain in meaning, or conflicting that a court has the right to interpret a statute." *Id.*

Ambiguity in a statute exists only if its language is susceptible of more than one reasonable interpretation. See, *e.g.*, *State ex rel. Toledo Edison Co. v. Clyde* (1996), 76 Ohio St.3d 508, 513, 668 N.E.2d 498, 505. Thus, inquiry into the legislative intent, legislative history, public policy, the consequences of an interpretation, or any of the other factors identified in R.C. 1.49 is inappropriate absent an initial finding that the language of the statute is, itself, capable of more than one meaning. See, *e.g.*, *Toledo, supra;* see, also, *Fairborn v. DeDomenico* (1996), 114 Ohio App.3d 590, 593, 683 N.E.2d 820, 823 ("R.C. 1.49 does not, however, authorize judicial inquiry into legislative intent where the statute is unambiguous"); see, also, *In re Collier, supra,* at 237, 619 N.E.2d at 507. ("Courts do not have the authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but must give effect to the words used.") Thus, a court's understanding of legislative intent alone cannot make an otherwise clear statute ambiguous.

Here, there is no ambiguity in the relevant statutes and no conflict between them. In fact, appellant has manufactured a conflict where none exists by incorrectly assuming, (1) that the provisions of R.C. 3107.07 trump the provisions of R.C. 3107.06, and (2) that a putative father always remains a putative father. We find, however, that the clear and unambiguous language of the relevant statutes anticipates this very case and provides, as the magistrate and trial court found, that if a putative father judicially establishes his parentage prior to the filing of the adoption petition, he ceases to be a putative father and, like any other father, his consent to the adoption is required.

First, contrary to the analysis advanced by appellant, we do not look first to the provisions of R.C. 3107.07 to determine whether Phelps's consent is required. Rather, the first determination is whether Phelps is or is not a person whose consent is generally required as provided by R.C. 3107.06. If so, the second determination is whether Phelps' consent is excused by operation of R.C. 3107.07. Relevant here, the consent of a putative father is generally required under R.C. 3107.06(C) unless that consent is excused under R.C. 3107.07(B)(2) because the putative father, among other things, fails to timely register. In contrast, however, the consent of a father who judicially establishes his parentage prior to the filing of the adoption petition is required under R.C. 3107.06(B)(3). Thus, the

relevant inquiry under application of both R.C. 3107.06 and 3107.07 is whether Phelps is or is not a putative father.

R.C. 3107.01(G) defines "putative father" as:

"* * * [A] man, including one under age eighteen, who *may be* a child's father and to whom *all* of the following apply:

"(1) He is not married to the child's mother at the time of the child's conception or birth;

"(2) He has not adopted the child;

"(3) *He has not been determined, prior to the date a petition to adopt the child is filed, to have a parent and child relationship with the child by a court proceeding pursuant to sections 3111.01 to 3111.19 of the Revised Code,* a court proceeding in another state, an administrative agency proceeding pursuant to sections 3111.20 to 3111.29 of the Revised Code, or an administrative agency proceeding in another state;

"(4) He has not acknowledged paternity of the child pursuant to section 5101.314 of the Revised Code." (Emphasis added.)

Under the clear language of R.C. 3107.01(G)(3), a man is no longer a putative father if, prior to the filing of a petition to adopt, he has been judicially determined under R.C. Chapter 3111 to be the father of the child. Here, Phelps was judicially declared the father of Baby Boy Brooks on August 17, 1998, approximately six weeks prior to the filing of the petition for adoption. Thus, while Phelps was a putative father until August 17, 1998, he ceased being a putative father on that date. As such, the provisions under R.C. 3107.06 and 3107.07 governing the consent of a *putative* father no longer apply to Phelps. Rather, as specifically stated by R.C. 3107.06(B)(3), consent from Phelps is required because he is a father who, prior to the filing of a petition to adopt the child, has been judicially declared to have a parent-child relationship with the child.

 Under well-established rules of statutory construction, "[t]his court in the interpretation of related and co-existing statutes must harmonize and give full application to all such statutes unless they are irreconcilable and in hopeless conflict." *United Tel. Co. of Ohio v. Limbach* (1994), 71 Ohio St.3d 369, 372, 643 N.E.2d 1129, 1131; see, also, *Bayside Nursing Ctr. v. Ohio Dept. of Health* (1994), 96 Ohio App.3d 754, 761, 645 N.E.2d 1314, 1318 ("Where, as here, two statutory provisions apply to the circumstances of a case, we are required, as much as possible, to construe the two provisions so as to give effect to both"). Under the appellant's interpretation, the relevant provisions of R.C. 3107.01(G) and 3107.06(B)(3), enacted as part of the same bill establishing the putative father

registry, are rendered meaningless. In contrast, however, under the interpretation adopted here (and followed by the magistrate and trial court), all relevant provisions are given effect. Pursuant to R.C. 3107.07(B), consent is not required of a putative father who fails to register within thirty days of the child's birth, *if he is still a putative father when the petition for adoption is filed.* However, if a putative father judicially establishes parentage prior to the filing of the adoption petition, he ceases to be a putative father and his consent is required pursuant to R.C. 3107.06(B)(3). In short, the language of the relevant statutes clearly and unambiguously provide that Phelps's consent is required in the adoption of Baby Boy Brooks.

Even if the relevant statutes were ambiguous, nothing in the legislative history of the General Assembly's 1996 enactment of the putative father registry suggests that the thirty-day filing requirement (R.C. 3107.07[B][1] ) takes precedence over the provisions in R.C. 3107.06(B)(3). First, the present language of both R.C. 3107.06(B)(3) and 3107.07(B)(1) were enacted in the same bill, Am.Sub. H.B. No. 419. See, generally, 1996 Baldwin's Ohio Legislative Service, Vol. 3, L–263. Thus, nothing in the timing of the legislature's passage of the thirty-day putative father registration requirement indicates that the legislature intended that it trump those provisions requiring the consent of an adjudicated father.

Second, appellant attaches too much importance to the legislature's rejection of a ten-day grace period for those putative fathers who were unable to register for reasons beyond their control. Certainly, the legislature intended to preclude putative fathers from raising fact-specific, equitable excuses for their failure to register in a timely manner. Thus, consistent with the statute and its legislative history, the magistrate and trial court here properly found that Phelps's equitable arguments concerning the reasons for his untimely filing with the putative father registry were legally irrelevant. However, nothing in the legislature's rejection of a grace period to the putative father registry requirement reveals an intention by the legislature to eliminate the consent requirement from a father who has judicially established his parentage before the filing of the adoption petition, especially considering that statutory language to the contrary is contained in the very same bill.

Because we find that Phelps's consent to the adoption of his son is required under Ohio law, appellant's first, second, and third assignments of error are not well taken, and are overruled.

■ In its fourth assignment of error, appellant contends that, even if Phelps's consent were required under the applicable statutes, the trial court erred in dismissing the petition for adoption without also considering the best interests of Baby Boy Brooks. Appellant apparently contends that an adoption may be

approved over the objection of one of the child's parents if the best interests of the child warrants it. We disagree.

■ An adoption in Ohio is a two-step process, involving first a determination whether parental consent is required and, second, whether the adoption is in the best interest of the child. R.C. 3107.14(C); *In re Adoption of Kuhlmann* (1994), 99 Ohio App.3d 44, 51, 649 N.E.2d 1279, 1283–1284; *In re Adoption of Jordan* (1991), 72 Ohio App.3d 638, 645, 595 N.E.2d 963, 967–968. Parental consent to an adoption, if required, is a jurisdictional prerequisite. *In re Adoption of Zschach*, at 657, 665 N.E.2d at 1077–1078; *McGinty v. Jewish Children's Bur.* (1989), 46 Ohio St.3d 159, 161, 545 N.E.2d 1272, 1274. Thus, upon finding that parental consent is required and denied, a probate court cannot then consider the best interest of the child because the court lacks jurisdiction to proceed. Appellant's fourth assignment of error is not well taken, and is overruled.

For the foregoing reasons, all four of appellant's assignments of error are overruled, and the judgment of the Franklin County Probate Court is affirmed.

*Judgment affirmed.*

PEGGY BRYANT, J., concurs.

KENNEDY, J., dissents.

KENNEDY, Judge, dissenting.

The majority holds that appellee, Theo Phelps' consent to the adoption is required because he established paternity before the adoption petition was filed. The majority contends that this result is required by the clear and unambiguous language of the adoption statutes. Because I find that the statutory language is ambiguous, that the majority's interpretation is contrary to the legislative history, and that the majority's interpretation undermines the effectiveness of the putative father registry, I respectfully dissent.

The Ohio General Assembly enacted Am.Sub.H.B. No. 419 in 1996, which altered the existing adoption statutes and created a putative father registry. See R.C. 3107.062 to 3107.065. Under R.C. 3107.062, a putative father must register no later than thirty days after the birth of a child. A search of the registry must be conducted before a final decree of adoption may be issued. R.C. 3107.064(A). R.C. 3107.06 lists the individuals from whom consent is required for an adoption to proceed, but it specifically provides an exception that "[u]nless consent is not required under section 3107.07 of the Revised Code," meaning that the exceptions in R.C. 3107.07 must be explored first. Under R.C. 3107.07(B)(1), consent to adoption is not required of a putative father who fails to register with the

putative father registry not later than thirty days after the child's birth. Moreover, R.C. 3107.061 provides that "[a] man who has sexual intercourse with a woman is on notice that if a child is born as a result and the man is the putative father, the child may be adopted without his consent pursuant to division (B) of section 3107.07 of the Revised Code." Thus, it appears from R.C. 3107.07(B)(1) and 3106.061 that the consent of a putative father to an adoption is not required if he fails to register with the putative father registry within thirty days of the child's birth.

However, under R.C. 3107.01(G)(3), the definition of a "putative father" does not include a man who has been determined in juvenile court to have a parent and child relationship with the child under R.C. 3111.01 to 3111.19. Moreover, R.C. 3107.06(B)(3) indicates that consent to adopt is required for a father who establishes paternity prior to the adoption petition being filed. Both the probate court magistrate and judge acknowledged that Phelps failed to file with the putative father registry within thirty days of the birth of Baby Boy Brooks, but then concluded that Phelps's consent was required because he was adjudicated to have a parent-child relationship with the child prior to the date the adoption petition was filed. Thus, R.C. 3107.07(B)(1), which indicates that the consent is not required for a putative father who fails to register within thirty days of the child's birth, is in conflict with R.C. 3107.01(G)(3) and 3107.06(B)(3), which appear to allow a putative father who does not register within thirty days to bypass the registration requirement by filing a paternity action in juvenile court as long as he is adjudicated to be the father prior to the filing of the adoption petition. Therefore, these statutes are ambiguous in that they are susceptible of more than one reasonable interpretation. *State ex rel. Toledo Edison Co. v. Clyde* (1996), 76 Ohio St.3d 508, 513, 668 N.E.2d 498, 504.

This court has held that, when a statute is subject to various interpretations, a court may invoke the rules of statutory construction to determine legislative intent. *Rajan v. State Med. Bd. of Ohio* (1997), 118 Ohio App.3d 187, 191, 692 N.E.2d 238, 241. Under R.C. 1.49, a court may look to a statute's purpose and legislative history to ascertain legislative intent. Additionally, the Supreme Court of Ohio has indicated that "[c]ourts review several factors in order to glean the General Assembly's intent, including the circumstances surrounding the legislative enactment, the history of the statute, the spirit of the statute (the ultimate results intended by adherence to the statutory scheme), and the public policy that induced the statute's enactment." *Toledo Edison* at 513–514, 668 N.E.2d at 504–505.

The Supreme Court of Ohio discussed the purpose behind Ohio's adoption statutes in *In re Adoption of Zschach* (1996), 75 Ohio St.3d 648, 651, 665 N.E.2d 1070, 1073:

"Ultimately, the goal of adoption statutes is to protect the best interests of children. In cases where adoption is necessary, this is best accomplished by providing the child with a permanent and stable home, see *In re Adoption of Ridenour* (1991), 61 Ohio St.3d 319, 328, 574 N.E.2d 1055, 1063, and ensuring that the adoption process is completed in an expeditious manner. See *In re Adoption of Baby Girl Hudnall* (1991), 71 Ohio App.3d 376, 380, 594 N.E.2d 45, 48. If these goals are met, the new parent-child relationship will have the best opportunity to develop fully."

Additionally, the Supreme Court of Ohio has held that adoption laws are in derogation of the common law and must be strictly construed. *In re Adoption of Zschach* at 655, 665 N.E.2d at 1076, citing *Lemley v. Kaiser* (1983), 6 Ohio St.3d 258, 260, 6 O.B.R. 324, 326–327, 452 N.E.2d 1304, 1307.

The Ohio Legislative Service Commission prepared an analysis of Am.Sub. H.B. No. 419, which provides insight into the legislative intent behind the changes to the adoption statutes. 3 Baldwin's Ohio Legislative Service (1996), L–336. The Legislative Service Commission cautions that the final version of bills may be different from the legislative analysis because they are subject to floor amendments and conference committee changes. *Id.* According to the analysis, the changes to the adoption laws require a putative father to register with the putative father registry within thirty days of the child's birth or his consent will not be required. *Id.* at L–336, L–346. The original version of R.C. 3107.07(B)(1), as amended by Am.Sub.H.B. No. 419, contained an exception to the requirement of registration within thirty days if the putative father was not able to register within the thirty-day time period for reasons beyond his control, other than a lack of knowledge of the child's birth, but the putative father must register within ten days after it becomes possible for him to register or his consent will not be required. *Id.* at L–287, L–346. However, this exception in R.C. 3107.07(B)(1) was removed from the final version of Am.Sub.H.B. No. 419. See R.C. 3107.07(B)(1), effective September 18, 1996. Thus, the General Assembly determined that there would be no exceptions to the thirty-day filing requirement.

Given that the legislature did not intend for there to be any exceptions to the registration requirement, that the purpose of the adoption laws is to provide children with a stable home in an expeditious manner, and that adoption laws are to be strictly construed, I conclude that the General Assembly intended in R.C. 3107.07(B)(1) to eliminate the necessity of a putative father's consent to an adoption if he fails to register with the putative father registry within thirty days of the child's birth. Although a putative father may still establish paternity under R.C. Chapter 3111 in juvenile court after the thirty-day registration period has lapsed, his consent to the adoption will not be required. However, he may

participate in the best interest portion of the adoption proceeding as provided in R.C. 3107.161.

The majority's conclusion, that the failure to register is irrelevant as long as paternity is established prior to the filing of the adoption petition, would create a race to the courthouse and undermine the effectiveness of the putative father registry. This argument also is inconsistent with the public policy of promoting stability and certainty in the adoption process and would discourage prospective adoptive parents from developing an emotional bond with a child whom they could lose any time prior to the filing of the final adoption petition.

Additionally, the majority's interpretation of the registration requirement is inconsistent with the law in other jurisdictions that have adopted similar putative father registration statutes. See, *e.g.*, Aizpuru, Protecting the Unwed Father's Opportunity to Parent: A Survey of Paternity Registry Statutes (1999), 18 Rev.Litig. 703 (noting that the more common approach among states with paternity registries is for parental rights to terminate automatically after the expiration of the registration period). For example, under the New Mexico statute, a putative father's failure to register with the putative father registry within ten days of the child's birth eliminates the necessity of his consent to an adoption. N.M. Laws 32A–5–19(E); see, also, Ala.Code 26–10C–1(i) (any person claiming to be the father of a child who fails to file with the putative father registry within thirty days of the child's birth shall be deemed to have given irrevocable implied consent to adoption); Ariz.Rev.Stat.Ann. 8–106.01(E) (failure to file within thirty days waives the right to notice to an adoption proceeding and consent is not required unless he proves by clear and convincing evidence that it was not possible to file within the time period and he filed within thirty days after it became possible to file); Idaho Code 16–1513 (failure to file within the time period bars the father from bringing a paternity action, constitutes an abandonment of the child, and is prima facie evidence of sufficient grounds to terminate father's parental rights); 750 Ill.Comp.Stat.Ann. 50/12(h) (failure to register within thirty days bars the father from bringing any action to assert any interest in the child unless he proves by clear and convincing evidence that he was unable to register within the period, the failure to register was through no fault of his own, and he registered within ten days after he became able to register); Ind.Code 31–19–5–18 (failure to register within the time period waives notice of an adoption proceeding and constitutes an irrevocably implied consent to an adoption). Courts in other states have strictly applied their putative father registry requirements, even when the putative father was misled by the mother about his paternity or the birth of the child. See, *e.g.*, *In the Matter of the Petition of K.J.R. and D.F.R. to Adopt O.J.M., aka O.J.K.* (1997), 293 Ill.App.3d 49, 227 Ill.Dec. 190, 687 N.E.2d 113 (holding that the putative father's failure to

register precluded his bringing a paternity action despite the mother's misrepresentation that another man was the child's father); *In the Matter of Robert O. v. Russell K.* (1992), 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99 (holding that the father could not vacate an adoption because he failed to grasp any opportunity to assert an interest in the child, including registering with the putative father registry, even though he was unaware of the child's birth).

Moreover, the Supreme Court of the United States has upheld a putative father registration statute that eliminates a putative father's right to have notice of and participate in an adoption proceeding for failure to register within the statutory time period. *Lehr v. Robertson* (1983), 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614. The Supreme Court found that New York's failure to provide a father with notice of adoption proceedings did not violate his due process rights where he could have protected his opportunity to form a relationship with the child by filing with the putative father registry. *Lehr* at 264, 103 S.Ct. at 2994–2995, 77 L.Ed.2d at 628–629. The Supreme Court indicated that the mere existence of a biological relationship was insufficient in and of itself to give rise to a constitutionally protected interest in a child:

"The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." *Id.* at 262, 103 S.Ct. at 2993–2994, 77 L.Ed.2d at 627.

The Supreme Court found that the New York putative father registry statute was constitutional in that it provided a putative father with an adequate opportunity to preserve his interest in his child, and noted that "[b]y mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt Jessica. The possibility that he may have failed to do so because of his ignorance of the law cannot be a sufficient reason for criticizing the law itself." *Id.* at 264, 103 S.Ct. at 2995, 77 L.Ed.2d at 628.

Because I find that Phelps's consent to the adoption of Baby Boy Brooks was not required, I respectfully dissent.